

THE LAW OFFICE OF

# MATTHEW GALLUZZO

PLLC

11 BROADWAY, SUITE 715    NEW YORK, NEW YORK 10004
Tel. (212) 344-5180    www.criminal-defense.nyc

The Hon. Margo K. Brodie
United States District Judge
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201
*By ECF*

Re:  *U.S. v. Babafemi, 13-cr-00109(MKB)*

Dear Judge Brodie,

Pursuant to 18 U.S.C. §3582(c)(1)(A) and 28 C.F.R. § 571.61, I respectfully request that the Court modify the 22-year prison sentence imposed upon Lawal Babafemi and re-sentence him to time served. We move for this extraordinary remedy to meet an equally extraordinary problem: Mr. Babafemi's documented chronic kidney disease places him at significantly greater risk of contracting COVID-19 and suffering its most dire complications if he does. This risk – coupled with the BOP's sub-standard medical care and the harsh custodial restrictions put in place to curb the spread of the coronavirus – presents "extraordinary and compelling" reasons to resentence Mr. Babafemi. Notably, Mr. Babafemi – a Nigerian citizen presently incarcerated at FCI Allenwood Low – has already consented to a judicial order of removal from this country. As such, if he were released early by this Court, he would be taken into custody by immigration agents and removed to Nigeria. Moreover, on account of this conviction, he would obviously be permanently ineligible to ever re-enter the country.

1



THE LAW OFFICE OF
# MATTHEW GALLUZZO
PLLC

11 BROADWAY, SUITE 715    NEW YORK, NEW YORK 10004
Tel. (212) 344-5180    www.criminal-defense.nyc

## I.    Procedural history

Mr. Babafemi was arrested in Nigeria in August 2011 and remained in custody there until his extradition to the United States two years later. He ultimately pleaded guilty before Judge Gleeson in 2014, who sentenced Mr. Babafemi in August 2015 to a total of 22 years (consisting of two consecutive sentences of fifteen and seven years). Since then, Mr. Babafemi has been primarily incarcerated at Allenwood FCI Low (his current location). His scheduled release date, according to the Bureau of Prisons, is July 5, 2030.[1] As such, he has served just over 50% of his sentence.

Mr. Babafemi made a request for compassionate release to the Bureau of Prisons by sending an electronic Request to Staff on July 13, 2020 (see Petitioner's *Pro Se* Motion to Reduce Sentence, at Exhibits A & B).[2] This application – submitted to the warden of his facility – requested compassionate release based upon his health conditions and the COVID-19 situation at the facility. The warden denied the request on July 24, 2020.

On August 21, 2020, after more than 30 days had elapsed from that denial, Mr. Babafemi submitted a *pro se* Motion to Reduce Sentence (see ECF Document Number 70). The undersigned was originally appointed to represent Mr. Babafemi, pursuant to the Criminal Justice Act, in

---

[1] Mr. Babafemi's location and scheduled release date can be confirmed by the Bureau of Prisons online inmate locator system, available at https://www.bop.gov/inmateloc/

[2] Mr. Babafemi's *pro se* Motion to Reduce Sentence is attached hereto as Exhibit A.

2



11 BROADWAY, SUITE 715     NEW YORK, NEW YORK 10004
Tel. (212) 344-5180     www.criminal-defense.nyc

connection with a previously-submitted *pro se* Motion to Vacate pursuant to 28 U.S.C. § 2255 (see ECF Documents 66, 67, and 78), and was then appointed again to assist with this instant application (see ECF Document 77). Undersigned counsel now submits this supplemental letter motion in support of Mr. Babafemi's Motion to Reduce Sentence.

## II.     Applicable law

As a preliminary matter, Mr. Babafemi satisfied the requirements of 18 U.S.C. §3582(c)(1)(A) prior to filing the instant Motion for Compassionate Release by making a procedurally proper request to the Bureau of Prisons and waiting an additional 30 days to submit his application to this Court.

This Court plainly has the authority to grant Mr. Babafemi's request. The First Step Act "embodies Congress's intent to reduce the Bureau of Prisons' authority over compassionate release petitions and authorizes the district courts to exercise their independent discretion to determine whether there are 'extraordinary and compelling reasons; to reduce a sentence.'" United States v. Spinks, 2020 U.S. Dist. LEXIS 194815, at *2-3 (S.D. W.Va.) (citations omitted). A district court may reduce a prisoner's sentence where the prisoner has exhausted his/her administrative remedies, has demonstrated "extraordinary and compelling reasons," is not a danger to the safety of others, and where his/her release is consistent with the §3553(a) factors. Id; see also e.g. United States v. Howard, 2020 U.S. Dist. LEXIS 79691 (E.D.N.C. May 6, 2020). Though the "mere presence of COVID-19 in a particular prison (or in the [Bureau of Prisons] generally) cannot justify compassionate release,"

3



THE LAW OFFICE OF —————————
MATTHEW GALLUZZO
————————————————— PLLC

11 BROADWAY, SUITE 715     NEW YORK, NEW YORK 10004
Tel. (212) 344-5180     www.criminal-defense.nyc

<u>United States v. Pettis</u>, 2020 U.S. Dist. LEXIS 240190, at * 7-8 (E.D. Wi. Dec. 22, 2020), many courts have found "extraordinary and compelling" reasons "supporting release on the basis of a combination of dire prison conditions and underlying health conditions that increase the likelihood of severe illness from COVID-19." <u>Spinks</u>, <u>supra</u>, at *4, <u>citing</u> <u>United States v. Bass</u>, 2020 U.S. Dist. LEXIS 102543, at *7 (N.D.N.Y. May 27, 2020); <u>United States v. Sawicz</u>, 2020 U.S. Dist. LEXIS 64418 (E.D.N.Y. April 10, 2020). Moreover, 18 U.S.C. § 3582(c)(1)(A) allows for any sentence reduction provided that the reduction is warranted by "extraordinary and compelling reasons" and is appropriate in light of applicable §3553(a) factors. <u>United States v. Brooker</u>, 976 F.3d 228, 2020 WL 5739712 (2nd Cir. 2020); <u>United States v. Wilson</u>, 2020 U.S. Dist. LEXIS 242191, at *1 (Dist. Alaska, Nov. 3, 2020) (Noting that "[c]ourts have found that the existence of a mandatory minimum sentence does not limit courts' ability to grant compassionate release."); <u>United States v. Bass</u>, <u>supra</u>, at 67 n. 11 (collecting cases and finding that "[t]he statutory minimum therefore does not limit this Court's discretion in ordering... early release.").

**III.** **<u>There exist extraordinary and compelling reasons to modify Mr. Babafemi's sentence</u>**

As explained below, Mr. Babafemi's chronic kidney disease coupled with BOP's dangerously inadequate health care combine to form extraordinary and compelling reasons to reduce Mr. Babafemi's sentence. The requested sentencing reduction is also consistent with applicable §3553(a) factors, as well as the need to protect the public. *Brooker* makes clear that this Court may

4



THE LAW OFFICE OF
MATTHEW GALLUZZO
PLLC

11 BROADWAY, SUITE 715     NEW YORK, NEW YORK 10004
Tel. (212) 344-5180     www.criminal-defense.nyc

exercise its discretion to determine what constitutes "extraordinary and compelling" circumstances.

a.   Mr. Babafemi's documented chronic kidney disease (Stage III) places him at heightened risk for COVID-19's worst outcomes.

Mr. Babafemi seeks release because his chronic kidney disease (stage III) places him at a high risk for serious consequences from COVID-19. Mr. Babafemi's medical records confirm that he does indeed currently suffer from chronic kidney disease (stage III), a disease that can cause fatigue, anemia, high blood pressure, difficulty breathing, urination issues, swelling of the extremities, kidney pain (felt in the back), and sleep problems, among other symptoms.[3] The Center for Disease Control and Prevention (CDC) has recognized that people with chronic kidney disease are at higher risk for suffering serious complications from COVID-19, including death.[4]

Courts across the country considering compassionate release applications have also recognized the danger presented by chronic kidney disease. For example, in U.S. v. Wilson, supra, the Court granted compassionate release to a 42-year-old inmate in a case where the "gravamen" of

_____

[3] See "Stages of Chronic Kidney Disease," American Kidney Fund, September 29, 2020, available at https://www.kidneyfund.org/kidney-disease/chronic-kidney-disease-ckd/stages-of-chronic-kidney-disease; "Stage 3 of Chronic Kidney Disease," Davita Kidney Care, Inc., available at https://www.davita.com/education/kidney-disease/stages/stage-3-of-chronic-kidney-disease

[4] See "COVID-19: People with Certain Medical Conditions," Center for Disease Control and Prevention website, updated December 29, 2020 and available online at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html



THE LAW OFFICE OF
MATTHEW GALLUZZO
PLLC

11 BROADWAY, SUITE 715    NEW YORK, NEW YORK 10004
Tel. (212) 344-5180    www.criminal-defense.nyc

the application was that the inmate suffered from chronic kidney disease (stage III). That court noted

that chronic kidney disease is in the same risk category as cancer, heart failure, and immune diseases

when it comes to COVID-19 (citing the Center for Disease Control and Prevention website), and

granted the application in light of numerous cases of COVID-19 at the applicant's facility. Wilson,

at *5; see also United States v. Khair, 2020 U.S. Dist. LEXIS 212783, * 7 (D. N.J. Nov. 13, 2020)

(denying release on 3553(a) grounds but finding that chronic kidney disease presented an

'extraordinary and compelling reason for compassionate release'); United States v. Brown, 2020 U.S.

Dist. LEXIS 178939, at *3 (E.D. Pa. Sept. 29, 2020) ("Courts have determined

that chronic kidney disease can     present     an     'extraordinary     and     compelling'     reason

for compassionate release."); United States v. Rodrequis Council, 2020 U.S. Dist. LEXIS 158806, at

*2 (M.D. Pa. Sept. 1, 2020) (finding defendant's medical conditions, which

included chronic kidney disease, to be "extraordinary and compelling," noting that "[t]he risks posed

by chronic kidney disease ... have been confirmed by numerous studies"); United States v. Young,

2020 U.S. Dist. LEXIS 90537, at *5 (finding "compelling circumstances" warranting compassionate

release to home confinement where inmate suffered from hypertension and chronic kidney disease);

United States v. Reece, 2020 U.S. Dist. LEXIS 61490, at *3 (S.D. Tex. March 27, 2020) (granting

application for compassionate release in light of COVID-19 and inmate's hepatitis C, enlarged

prostate, and chronic kidney disease).

6



11 BROADWAY, SUITE 715    NEW YORK, NEW YORK 10004
Tel. (212) 344-5180    www.criminal-defense.nyc

b.  The BOP is ill-equipped to properly care for an at-risk inmate like Mr. Babafemi

The world is now at the height of the global pandemic with the United States tragically leading the way, with over 400,000 confirmed deaths to date. A significant driver of the virus' spread has been through our country's jails and prisons. According to the Marshall Project, which has been tracking COVID-19 cases in incarcerated individuals, there have been at least 197,659 prisoners who have tested positive for Covid-19 and 1,454 deaths as of November 17, 2020. BOP inmates represent 22,203 of those cases, at a rate of 1,506 prisoners per 10,000 testing positive. BOP inmates also account for at least 152 deaths, second only to Florida and Texas.[5] Of course, these statistics only include tested inmates and therefore likely underreport the total number of cases.

It should come as no surprise that COVID-19 has spread like wildfire throughout the Bureau of Prisons system, as medical experts overwhelmingly agree that prisons are especially dangerous places for infection. One expert has asserted that "[p]risons are petri dishes for contagious respiratory illnesses."[6] Inmates cycle in and out of Bureau of Prisons (BOP) pretrial facilities from

---

[5] The Marshall Project, *A state-by-state look at coronavirus in prisons,* November 20, 2020, available at  https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-  in-prisons (last visited on November 30, 2020).

[6] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, LOS ANGELES TIMES (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration; Joseph A. Bick,  *Infection Control in Jails*



11 BROADWAY, SUITE 715     NEW YORK, NEW YORK 10004
Tel. (212) 344-5180     www.criminal-defense.nyc

all over the world and the country, and people who work in the facilities leave and return daily,

without screening or testing:

> "The people who work [in prisons] enter and leave every day. They can take the virus out into the community when they go home at night. It's also important to remember that correctional institutions have been exempted from current federal guidelines aimed at protecting people in workplaces and in large housing complexes. There are many reasons to be concerned about this, beyond the dangers to the people inside."[7]

Even in the best of times, when they are not besieged by highly-contagious global pandemic viruses

like COVID-19, prisons and jails have "long been known to be associated with high transmission

probabilities of infectious diseases."[8] Incarcerated individuals "are at special risk of infection" and

---

*and Prisons*, CLINICAL INFECTIOUS DISEASES 45(8):1047-1055 (2017), at https://doi.org/10.1086/521910.

[7] Edmund L. Andrews, *Stanford Researchers find COVID-19 spreads faster in American jails than on cruise ships,* Stanford News, September 24, 2020, available at https://news.stanford.edu/2020/09/24/covid-19-spread-american-prisons/ (last visited on November 30, 2020).

[8] Letter from Patricia Davidson, Dean, Johns Hopkins School of Nursing, et al., to Hon. Larry Hogan, Governor of Maryland (Mar. 25, 2020), https://bioethics.jhu.edu/wpcontent/uploads/ 2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf (letter co-signed by over 200 faculty members of Johns Hopkins Bloomberg School of Public Heath, School of Nursing, and School of Medicine); see also Dr. Giftos Affidavit, at Paragraph 11 ("Correctional settings increase the risk of contracting infectious disease, like COVID-19, due to the high numbers of people with chronic, often untreated illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and no possibility of saying at a distance from others… fighting the spread of an infection is nearly impossible.").



THE LAW OFFICE OF
# MATTHEW GALLUZZO
PLLC

11 BROADWAY, SUITE 715     NEW YORK, NEW YORK 10004
Tel. (212) 344-5180     www.criminal-defense.nyc

"infection control is challenging."[9]  Prisons and jails "contain high concentrations of people in close proximity and are breeding grounds for uncontrolled transmission [of infection]."[10] After all, incarcerated individuals share bathrooms, sinks, and showers. They eat together and sleep in close proximity to each other. They often lack access to basic hygiene items, much less the ability to regularly disinfect their living quarters.[11] "The conditions and reality of incarceration makes prisons and jails tinderboxes for the spread of disease."[12]

---

[9] Open Letter from Dr. Gregg S. Gonsalves, Assistant Professor, Department of Epidemiology of Microbial Diseases, Yale School of Public Health, et al. to Vice President Mike Pence and Other Federal, State and Local Leaders 4 (Mar. 2, 2020), available online at https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf (co-signed by 814 experts in public health, law and human rights); *see also* Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047-155 (2007), https://doi.org/10.1086/521910.

[10] Letter from Dr. Sandro Galea, Dean, Boston University School of Public Health, et al., to President Trump 1 (Mar. 27, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions) ("Public Health Experts' Letter").

[11] Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. Is Failing Federal Inmates as the Coronavirus Hits*, Vice News (March 24, 2020) (noting access to hand sanitizer varies by facility), at https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits

[12] Kimberly Kindy, *An explosion of coronavirus cases cripples a federal prison in Louisiana* (March 29, 2020), WASHINGTON POST (quoting Udi Ofer, director of the American Civil Liberties Union's Justice Division), at https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-



11 BROADWAY, SUITE 715     NEW YORK, NEW YORK 10004
Tel. (212) 344-5180     www.criminal-defense.nyc

BOP has hardly been exempt from this reality. A 2015 Bureau of Justice Statistics report found that persons incarcerated in state and federal prisons and jails were more likely than the general population to have a chronic condition or an infectious disease.[13] And BOP and its staff have acknowledged that infection control is difficult in the prison setting.[14] BOP facilities remain overcrowded. Low, medium, and high facilities are all operating at overcapacity and BOP's total inmate population exceeds the rated capacity of its prisons by an average of 12 to 19 percent.[15] As such, CDC recommendations such as social distancing are practically impossible to achieve in our federal prisons as things currently stand.

Indeed, BOP has long since proven itself incapable of protecting the health of the people

---

cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html

[13] See Laura M. Maruschak et al., *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-2012*, U.S. Dep't of Justice, Ofc. of Justice Programs, Bureau of Justice Statistics (Rev. Oct. 4, 2016), at https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[14] See Fed. Bureau of Prisons, *Program Statement 6190.04: Infectious Disease Management* (Jun. 3, 2014), https://www.bop.gov/policy/progstat/6190_004.pdf.

[15] See Fed. Bureau of Prisons, *Federal Bureau of Prisons Program Fact Sheet* (rev. July 31, 2019), https://www.bop.gov/about/statistics/docs/program_fact_sheet_20191004.pdf; see also U.S. Dep't of Justice, *FY2020 Performance Budget Congressional Submission Federal Prison Systems Buildings and Facilities* 3, https://www.justice.gov/jmd/page/file/1144631/download (last visited Apr. 1, 2020).

10



THE LAW OFFICE OF

MATTHEW GALLUZZO
PLLC

11 BROADWAY, SUITE 715    NEW YORK, NEW YORK 10004
Tel. (212) 344-5180    www.criminal-defense.nyc

within its walls – even on an ordinary day prior to the pandemic.[16] In 2016, DOJ's Office of Inspector General (OIG) found that BOP experienced chronic medical staff shortages and failed to take adequate measures to address them, endangering the safety and security of its institutions. From 2010 to 2014, BOP's total medical staff was "approximately 17 percent less than what BOP projected was necessary to provide what is considers to be 'ideal care,' and 12 institutions were so medically understaffed that they were described as 'crisis level.'" Lack of adequate staffing resulted in medical personnel and other non-correctional staff working as guards, and made wait times for individuals to receive even routine medical care unacceptably long.[17] Our city's hospitals were completely overwhelmed by the pandemic, and one cannot realistically expect the already chronically-understaffed Bureau of Prisons to be able to effectively combat this crisis.

In response to this heightened risk, ex-Attorney General Barr and the United States Congress recognized that home confinement for low-risk non-violent prisoners was a priority to help minimize the rate of infection and risk from Covid-19.[18] But the broad consensus is that the government's

---

[16] See U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf

[17] U.S. Dep't of Justice Office of the Inspector General, *The Impact of an Aging Population on the Federal Bureau of Prisons* (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf

[18] See "Memorandum for Director of Bureau of Prisons: Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic," Office of Attorney General, Mar. 26, 2020



11 BROADWAY, SUITE 715    NEW YORK, NEW YORK 10004
Tel. (212) 344-5180    www.criminal-defense.nyc

efforts here have fallen woefully short. "The releases among sentenced jail and prison populations that have occurred have, for the most part, occurred on a case-by-case basis and have been procedurally slow and not well suited to crisis situations."[19]

Mr. Babafemi is incarcerated at Allenwood FCI Low, a facility in Pennsylvania.[20] Many other federal district courts have considered compassionate release applications from inmates at this facility. and those courts have generally concluded that the facility is an especially dangerous place for a medically vulnerable person during the pandemic. See e.g. United States v. Pettis, 2020 U.S. Dist. LEXIS 240190, at *10 (E.D. Wis. Dec. 22, 2020) (granting compassionate release application for inmate at Allenwood FCI Low, in part because facility was on lockdown due to COVID-19, had

---

(prioritizing home confinement and noting that "there are some at-risk inmates who are non- violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities"); Coronavirus Aid, Relief, and Economic Security (CARES) Act 2020, Pub. L. No. 116-136, 116th Cong., Title VI § 12003, pg. 634 (2020)(amending 18 U.S.C. § 3624 (c) to eliminate time limits on the use of home confinement for the duration of the COVID-19 crisis).

[19] The Editorial Board, *America Is Letting the Coronavirus Rage Through Prisons*, THE NEW YORK TIMES, November 21, 2020, at https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html

[20] Notably, there is an Allenwood FCI Low, an Allenwood FCI Medium, and a USP Allenwood; they are neighboring facilities but obviously the inmates do not meaningfully interact with each other. It is unknown whether some support staff might work at multiple facilities.



11 BROADWAY, SUITE 715    NEW YORK, NEW YORK 10004
Tel. (212) 344-5180    www.criminal-defense.nyc

135 confirmed positives inmate cases and nine staff cases, and the medical situation was worsening for vulnerable inmates); United States v. Newkirk, 2020 U.S. Dist. LEXIS 232477, at *7-8 (S.D.N.Y. Dec. 20, 2020) (considering the conditions at adjoining Allenwood Medium FCI, where 45 inmates and 9 staff had tested positive for COVID-19 as of December 2020); United States v. Spinks, U.S. Dist. LEXIS 194815, at *2, 10 (D. W.Va. Oct. 21, 2020) (noting that Allenwood FCI was in the "middle of a COVID-19 outbreak"); but see United States v. Calloway, 2020 U.S. Dist. LEXIS 238246, at *7 n.1 (E.D. Pa. Dec. 18, 2020) (noting that although Allenwood Medium recently had a COVID-19 outbreak, it had "successfully mitigated" the spread and had suffered no fatalities from the virus).

Accordingly, in light of Mr. Babafemi's medical condition and the conditions within Allenwood FCI Low, the court should conclude that there exist "extraordinary and compelling conditions" justifying Mr. Babafemi's compassionate release.

**IV. Resentencing Mr. Babafemi is appropriate when considering applicable §3553(a) factors.**

Finally, the relevant §3553(a) factors support a sentencing reduction for Mr. Babafemi. The Court no doubt has concerns about granting a compassionate release motion to someone convicted of the crimes for which Mr. Babafemi pleaded guilty. Mr. Babafemi, however, is not the sort of radicalized fundamentalist whose incarceration is necessary for public protection. As his defense

13



11 BROADWAY, SUITE 715     NEW YORK, NEW YORK 10004
Tel. (212) 344-5180     www.criminal-defense.nyc

attorney noted at sentencing, Mr. Babafemi never behaved in court proceedings like many jihadists do: he never denounced the court, nor made any threats against America, nor issued any defiantly fundamentalist proclamations. In fact, he explicitly denounced Al-Qaeda and apologized for his actions at sentencing (see Exhibit B [sentencing transcript], at 14-15).[21] Rather than stay true to the cause, so to speak, Mr. Babafemi pleaded guilty and appears to deeply regret his association with the organization (see 18 U.S.C. § 3553(a)(1)). It seems that Mr. Babafemi was a desperate and destitute man struggling to support himself and his family when he was persuaded to associate with Al Qaeda (see Presentence Report, at Paragraphs 50-54; see also Defense Sentencing Submission [ECF Document 58], at pp. 8-9). Having realized his mistakes, he wishes now only to return home to his family. Notably, he appears to have made arrangements with other members of his family in Nigeria to help him get back on his feet upon his return (see Petitioner's *Pro Se* Motion, at Exhibit F [affidavit

---

[21] From the sentencing submission submitted by defense counsel (ECF Document 58, at p. 4): "In the dozens of hours that I've spent with Mr. Babafemi over the past 16 months, he has not uttered a single pro jihadist or radical Islamist word. Unlike some other defendants in his position, he has not used our judicial system as a platform for espousing radical ideology. He has expressed no distaste, hatred, or rancor against the American government, the American people, or me, his female, half-Jewish lawyer. He has developed positive relationships with inmates and guards at the MCC, and even provided medical assistance to a guard when all the other inmates present were content to leave him in distress. Mr. Babafemi denounces his actions in joining al-Qaeda, and he denounces al-Qaeda and violent extremism."



11 BROADWAY, SUITE 715     NEW YORK, NEW YORK 10004
Tel. (212) 344-5180     www.criminal-defense.nyc

from petitioner's brother]).

The facts and circumstances of his crime should not preclude his release, either. To be sure, his crimes were serious, and his sentence reflects that fact.[22] However, for the sake of comparison, last year a federal district court granted the compassionate release of an inmate named Sami Samir Hassoun. See U.S. v. Hassoun, 2020 U.S. Dist. LEXIS 129945 (N.D. Ill. July 3, 2020). Mr. Hassoun was arrested in 2010 after he deposited what he believed to be an explosive device into a trash can in a crowded neighborhood near Wrigley Field in Chicago, with the expectation that it would detonate and kill hundreds of Americans. However, the bomb was actually a phony device given to him by undercover law enforcement agents. Mr. Hassoun ultimately pleaded guilty to attempted use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a(a)(2)(D), and malicious attempt to destroy or damage a building using an explosive device in violation of 18 U.S.C. § 844(i), and received an aggregate sentence of 23 years. Last year, a federal district court granted his motion for compassionate release, concluding that despite his attempt to kill Americans, he would not be a threat to the American public, in part because he had consented to his deportation to Lebanon. See 18 U.S.C. § 3553(a)(2)(C). This Court should also conclude that this factor weighs in favor of Mr. Babafemi's release, as well. After all, Mr. Babafemi's crimes clearly presented less of a danger to the American

_____

[22] The Department of Probation actually recommended a much shorter sentence of 18 years. See Defense Sentencing Submission, at pp. 2-3.

15



11 BROADWAY, SUITE 715    NEW YORK, NEW YORK 10004
Tel. (212) 344-5180    www.criminal-defense.nyc

public than an actual attempted bombing of American citizens.[23] See 18 U.S.C. §3553(a)(1). Mr. Babafemi has served a similar percentage of his sentence as Mr. Hassoun, and, like Mr. Hassoun, he has also consented to deportation back to his native country.[24] Moreover, the Bureau of Prisons considers Mr. Babafemi to be a low risk for recidivism and an even lower risk (minimum risk) for violence (see Petitioner's *Pro Se* Motion, at Exhibit D [Bureau of Prisons Pattern Risk Assessment for Mr. Babafemi]). This is due in part to his good disciplinary history while incarcerated.

The sentence that Mr. Babafemi has already served has been significant enough to provide a deterrent effect to others considering similar crimes, as well. See 18 U.S.C. § 3553(a)(2)(B). First and foremost, Mr. Babafemi suffered extensive and repeated physical and emotional torture while incarcerated in Nigeria. See Presentence Report, at Paragraph 17; Defense Sentencing Submission, at pp. 11-18 (ECF Document 58); see also Exhibit B to Defense Sentencing Submission (clinical diagnosis of post-traumatic stress disorder stemming from Mr. Babafemi's torture in Nigeria). While the Nigerian government may deny this fact, see Government Sentencing Submission, at p. 7 (ECF

---

[23] In short, Mr. Babafemi was alleged to have conspired to provide material support to Al-Qaeda by agreeing to take some of the group's money and use it to recruit new English-speaking members. He also allegedly participated in the publication of a propaganda magazine for the organization. These actions allegedly transpired in Africa and the Middle East.

[24] Mr. Hassoun's compassionate release was granted after he had spent less than ten years in custody. Hassoun, at *3.



11 BROADWAY, SUITE 715    NEW YORK, NEW YORK 10004
Tel. (212) 344-5180    www.criminal-defense.nyc

Document 59), numerous international organizations have recognized the abuses regularly perpetrated on Nigerian inmates. See Defense Sentencing Submission, at pp. 15-18.

In addition to the PTSD he suffered at the hands of his Nigerian captors, Mr. Babafemi has suffered in ways greater than the typical inmate. Indeed, it cannot be disputed that Mr. Babafemi has been separated from his family in a foreign country – without any visits whatsoever – for almost a decade. His son is 11 years old and his daughter is 9 years old, and he has almost completely missed their entire childhoods. Mr. Babafemi has also suffered through a pandemic and the resultant harsh lockdown conditions while suffering from a chronic kidney disease that makes him vulnerable to COVID-19. In short, his incarceration in Nigeria and the U.S. these last ten years has hardly been easy from a physical, medical, or emotional standpoint.

Nevertheless, Mr. Babafemi has made serious efforts at rehabilitation. 18 U.S.C. § 3553(a)(1). The educational transcript supplied as Exhibit E to the *pro se* motion reflects well on Mr. Babafemi's character, in that it shows that he has taken the opportunity to better himself while incarcerated. Compare Hassoun, supra, at * 3 (granting motion for compassionate release, in part because "defendant has demonstrated that he has taken positive steps while serving his time in custody these past almost 10 years…").

17



THE LAW OFFICE OF
MATTHEW GALLUZZO
PLLC

11 BROADWAY, SUITE 715     NEW YORK, NEW YORK 10004
Tel. (212) 344-5180     www.criminal-defense.nyc

## V.  Conclusion

Mr. Babafemi's chronic kidney disease places him at higher risk of getting very sick from COVID-19, or dying. This risk coupled with the BOP's sub-standard medical care and harsh custodial restrictions put in place to curb the spread of the coronavirus have created extraordinary and compelling reasons to resentence Mr. Babafemi. Mr. Babafemi has already served over half of his sentence, and he would be immediately taken into custody by immigration officials and deported from the country upon his release from the Bureau of Prisons. Mr. Babafemi was a poor and desperate person struggling to support himself and a family when he made the poor decisions that led him here. He is not a zealot, however, and BOP believes that he poses a minimal risk to the public should the Court decide to release him. On the other hand, his continued incarceration during the pandemic poses a serious threat to Mr. Babafemi's life. At this point, Mr. Babafemi wants nothing more than to return to his family, meet the children he doesn't know, and try to earn an honest living to support them. In light of the extraordinary pandemic situation and the resultant urgent need to make our prisons less crowded, his request is reasonable and should be granted.

Sincerely,

Matthew Galluzzo, Esq.
Counsel for Lawal Babafemi

Cc:     AUSA Sarah Evans (by ECF)