1

1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - X
3   UNITED STATES OF AMERICA,      :
                                   :  13-CR-109(JG)
4                                  :
                                   :
5       -against-                  :
                                   :  United States Courthouse
6                                  :  Brooklyn, New York
                                   :
7   LAWAL BABAFEMI,                :
                                   :
8           Defendant.            :  Wednesday, August 12, 2015
                                   :  2:00 p.m.
9                                  :
                                   :
10                                 :
                                   :
11  - - - - - - - - - - - - - X

12      TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
          BEFORE THE HONORABLE JOHN GLEESON
13        UNITED STATES DISTRICT COURT JUDGE

14                A P P E A R A N C E S :

15  For the Government:   KELLY T. CURRIE, ESQ.
                          United States Attorney
16                        BY: ZAINAB AHMAD, ESQ.
                              HILARY JAGER, ESQ.
17                            Assistant United States Attorneys

18  For the Defendant:    FEDERAL DEFENDERS
                          BY: LISA HOYES, ESQ.
19

20                        UNITED STATES PROBATION DEPARTMENT
                          BY: JENNIFER FISHER, USPO
21

22
    Court Reporter:   FREDERICK GUERINO, CSR
23                    Official Court Reporter
                      Telephone: (718) 613-2503
24                    E-mail:  Frederickguerino@aol.com

25  Proceedings recorded by computerized stenography.  Transcript
    produced by Computer-aided Transcription.

3

1   that both sides have submitted in connection with

2   sentencing.  Thank you both for them, but I understand that

3   really could be more of a 3553 issue than a guideline

4   computation issue; is that right?

5          MS. HOYES:  Yes, your Honor.

6          THE COURT:  So we'll deal with it in that setting.

7   Any objection to the presentence report or the guideline

8   computation?

9          MS. HOYES:  No, your Honor.

10          THE COURT:  How about from the government?

11          MS. AHMAD:  No, Your Honor.

12          THE COURT:  So the advisory range, as I understand

13  it, is 292 to 365, but it's capped to 360, right?

14          MS. AHMAD:  That's correct.

15          MS. HOYES:  Yes.

16          THE COURT:  Okay.

17          There's some paperwork that's been submitted to me

18  in connection with conditions of confinement prior to the

19  extradition.  It's my intention to deal with that, to the

20  extent there is a dispute between the parties, to deal with

21  that by reference to the papers and not in any other way.

22          Any objection to that, Ms. Hoyes?

23          MS. HOYES:  No, your Honor.

24          THE COURT:  How about you?

25          MS. AHMAD:  No, Judge.

5

1          THE COURT:  Okay.  All right.

2          Would you like to be heard with regard to the

3    appropriate sentence?

4          MS. HOYES:  I would, your Honor.

5          Your Honor, we understand how serious this crime

6    is, and we seek a sentence here of 15 years, which is a huge

7    amount of time.  It is a sentence that sends a strong

8    message to foreigners considering joining Jihadist groups.

9    It's a sentence that would substantially punish Mr.

10   Babafemi.  And it is a sentence that would keep him

11   incapacitated until he's an old man by Nigerian standards

12   anyway.

13         He renders his wife a life without a partner, and

14   it's extremely likely that his mother will die while he's in

15   custody here in the United States.

16         Prison will be harsher for him than for others

17   because he has absolutely no ties to this country.  He will

18   never get a visit, have extremely minimum phone contact with

19   his family, which has been the case the entire time he's

20   been incarcerated here, and he will continue to suffer the

21   symptoms of posttraumatic stress disorder.

22         Your Honor, the Department of Probation evaluates

23   every single terrorism case, every single terrorism

24   defendant that is sentences in this courthouse.  They are

25   familiar with the range of conduct involved in these cases.

7

1          (Side bar)

2          MS. HOYES:  Your Honor, can my client come up

3    here?

4          THE COURT:  Yes, that's fine.  Bring him up, here,

5    please.

6          MS. HOYES:  Sorry to interrupt.  I just noticed

7    you mentioned the conditions of confinement.  You refer to

8    it as torture, and I know last night in your ruling that

9    that information is all unsealed and available to the press.

10   I wanted to make sure I wasn't missing anything.

11         THE COURT:  You are not.

12         MS. HOYES:  Before I make any public statements.

13         THE COURT:  I was being unnecessarily circumspect.

14         MS. HOYES:  Thank you.

15         THE COURT:  Okay.

16         (Side bar ends)

17

18

19

20

21

22

23

24

25

9

1   Slow down, please.

2          MS. HOYES:   -- I understand Islam to be the

3   religion of peace and harmony.   Even the profit Mohammed

4   preached peace and unity, and not the act of brutality and

5   barbarism.   The Islam that we are seeing through the world

6   is the so-called Islam Mr. Babafemi rejects of the violent

7   extremists.   It has been demonstrated repeatedly in the

8   letter to your Honor, and the way he comported himself in

9   this case since his arrest.

10          He made days of inculpatory statements to the FBI

11   and consented to extradition, and accepted responsibility

12   swiftly by pleading guilty to this case, and done in the way

13   he's comported himself in jail.

14          Mr. Babafemi has been at the MCC for approximately

15   two years now.   He's been in general population for the vast

16   majority of that time.   That means for two years he has been

17   observed on a daily by prison officials at the MCC.   And I

18   want to tell you what I think is not one of the strongest

19   objective indicators, but he's not a dangerous person or

20   dangerous Jihadist.   There was a rather young man that was

21   arrested for conspiring to join ISIS, and I happened to

22   represent that young man as well.   BOP placed that young man

23   in the same unit as Mr. Babafemi.   Not only that, the unit's

24   counselor brought this young man to Mr. Babafemi's cell

25   early one morning and asked him if he would befriend him and

11

1    United States, but never met another American person until

2    he was extradicted here for this offense.  He never received

3    any benefits or tastes of what this country has to offer.

4    And when he knows something through the lens of propaganda,

5    I submit it is possible to believe these hideous things.

6    And in jail what Mr. Babafemi has instead learned is about

7    the humanity of the American people.  He's come to know

8    criminal defendants and prison guards and lawyers.  He's

9    learned that Americans are people like him, people who have

10   mothers and fathers and who love their children.  And I

11   submit that betrayal exists when a person lives amongst us

12   and wants to destroy us is something uniquely disturbing

13   that is completely absent from this case.  Mr. Babafemi now

14   knows America has no animosity towards the country and its

15   people.

16           We talk about what are mitigating circumstances.

17   It is something about what is happening, the way things

18   happen in our lives that explain or shed light on our

19   misdeeds.

20           Mr. Babafemi as you know grew up in extreme

21   poverty in Nigeria, and I submit this is very different

22   growing up even with extreme poverty, possibly cutting

23   timber and eating wild animals, that is what he had to do to

24   feed his family.  I can't think of a single analogy in the

25   U.S.

13

1          THE DEFENDANT:  Yes, sir.

2          I want to say thank you for giving me this

3    opportunity to express my --

4          THE COURT:  Excuse me for one second.

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Could you put that microphone closer

7    to him.

8          THE DEFENDANT:  I want to start by saying I am

9    extremely sorry for anything that I have done in the United

10   States, and I want to say that it doesn't come -- I want to

11   say I denounce al-Qaeda and the extremist groups of the

12   world.

13          Their actions and my understanding now is

14   obviously I don't understand Islam like that, and the way

15   they act in brutality towards everyone that was against

16   them.  I want to say there were nights when I was in my cell

17   I was thinking about all what is going in Nigeria, and I

18   remember how ISIS took the journalist --

19          THE COURT:  I'm sorry, how ISIS what?

20          THE DEFENDANT:  Took the journalist and puts a

21   knife on his neck.  I afraid to imagine myself in such a

22   condition, if I was to do that to somebody and put a knife

23   on my neck, and they start to sweat like animal.  It was

24   extremely hard for me even to sleep at night, because I was

25   thinking how would they be feeling with that when that comes

15

1  indeed offended the Americans, because al-Qaeda has as our

2  number one enemy the United States, and help them in one way

3  or the other.

4          So, I will admit to my mistakes and I'm sorry.

5  And I hope this will end, so maybe I can make use of my

6  life, you know, my experience in people who need help in the

7  world that doesn't know what to do with their life.

8          THE COURT:  How?

9          THE DEFENDANT:  I believe there are many societies

10  -- they have been rejected by society.  They think they are

11  less bother to even themselves, and from this they think,

12  you know, they come from the right body.  I think I have to

13  make use of my life like this, joining maybe al-Qaeda or

14  ISIS or something like that.  But I hope, I hope that with

15  the knowledge I gained after I was arrested, maybe I can do

16  something to ISIS to make them see through what I have been

17  able to see through, that life is not like that.  There are

18  many ways to lead your life, even to be useful to

19  themselves, to their family, and to their society.

20          THE COURT:  You mean to talk them out of it?  Do

21  you mean to talk them out of joining Beko Haram or ISIS?

22          THE DEFENDANT:  Yes, if it's possible for them.

23          In my unit, there was one Spanish guy who embraced

24  Islam maybe about four, five months ago.  I was standing in

25  the unit and he came to me and we were talking.  He said,

17

1          Also, that his time in Nigerian custody was
2     certainly below the standards of the Federal Bureau of
3     Prisons, and therefore he should be given some credit for
4     that.
5          While we disagree with the point to the best of
6     our ability some evidence undermining the defendant's claim
7     that he was beaten while he was in custody and during his
8     interrogation, we certainly do agree that the conditions of
9     confinement there in terms of the facility and access to
10    medical care and the like, were sub-standard and below what
11    one would find in a BOP facility.
12          I think the most difficult issue presented today
13    under the statute is the question of what sentence will be
14    sufficient to protect the public from future crimes of the
15    defendant.
16          The defendant has put forth a forceful case that
17    he is a changed man, and has no intention to continue along
18    the path to violent Jihad upon which he started.
19          We believe that to a large extent his denunciation
20    of al-Qaeda, upon which he relies on making that point,
21    rings hollow.  That is principally because all of this
22    rejection of these violent extremist beliefs and of his
23    support for the goals of these sort of groups is not
24    accompanied by any reckoning of his adoption of those
25    beliefs.  In fact, he barely admits to ever having adopted

19

1    violent actions against the West in any and all forms.

2           He, along with another American citizen Samir

3    Khan, pioneered the publication of Inspire magazine, whose

4    goal, again, as described by AQAP, was to inspire and

5    counsel people as to how to commit lone-wolf attacks in the

6    West.  The defendant knew this.  He read Inspire before he

7    left on his trip to Yemen.  He discussed Inspire with other

8    people in Yemen.

9           More importantly, in December 2009, right around

10   the time the defendant embarked on his first journey to

11   Yemen, AQAP was in the news for having recruited a Nigerian

12   citizen to travel to Detroit and attempt to detonate a bomb

13   sewn into his underwear over U.S. air space.  The defendant

14   was well aware of this, as he has admitted.  All of this was

15   in his head before he undertook the first arduous journey

16   from Nigeria to Yemen, illegally crossing borders, going

17   through many military checkpoints from Cameroon to Chant, to

18   Chad, to Sudan, then smuggled by boat to Yemen, and then

19   smuggled in a bus to his ultimate destination.

20          So the fact that the defendant says it wasn't

21   until the United States submitted -- indicted him and

22   submitted an extradition request that the question "What

23   does my crime have to do with America" ever occur to him is

24   simply not credible.  That's what AQAP was known for, its

25   targeting of America; its targeting of the West.

21

1  coconspirator at his request sent an e-mail to al-Qaeda

2  letting them know that he had arrived, and that ultimately

3  led his being taken to various AQAP stake houses, where he

4  met other foreign fighters associated with the group, to

5  receive weapons training, and work on AQAP's communications

6  language media operations.

7          According to at least two people who were with the

8  defendant during that time period, he was a dedicated,

9  excited, and enthusiastic recruit to AQAP.

10         Again, it bears emphasis that all of the evidence

11  shows that the defendant went to Yemen with this goal.  The

12  defendant had never admitted that you.  He has given all

13  sorts of inconsistent statements about how he fell in with

14  al-Qaeda.  But the one consistent part is that he insists he

15  didn't go to Yemen with that intension.

16         According to the letters from his family, he gave

17  them all sorts varying explanations.  I think his mother

18  says he went to go get a job.  His wife says he went to

19  study Islam.  I'm not sure what he told everyone else, but

20  he doesn't seem to have ever really tell the truth about it.

21  The reason that's relevant here is because it's hard for us

22  to really rely on his assertions that he's changed his mind,

23  when he cannot come to terms with whether he made up his

24  mind in the first place to engage in violent Jihad.

25         According to the people who were in Yemen with the

23

1  security measures, how the members of the group dealt with

2  the internet and phone, and the precautions they took, how

3  they navigated through the area in order to avoid being

4  caught by Yemenese authorities, that al-Awlaki would let

5  someone with all of this information whom he didn't trust

6  leave Yemen, first and foremost, and on top of that go to a

7  country with an alliance with the United States, where he

8  would be able to reveal that information to anybody he chose

9  is simply not credible.

10         Again, I think the defendant's continual

11  misstatements on this regard, continual insistence that

12  firstly he never really fell in with AQAP wholeheartedly;

13  and, secondly, that even the actions he undertook on their

14  behalf were under duress, suggests that his true feeling

15  about this group and its goals are not known to us or to the

16  Court at this time, and that his words cannot been taken at

17  face value.

18         What we do know about al-Awlaki at this time, and

19  AQAP at this time, is that the group was focused on attacks

20  in the West.  The group was looking for foreign fighters,

21  meaning people with access to the United States and Europe.

22  The defendant's brother has been to the U.S. multiple times

23  for work as a respected executive in a multi-national

24  company.  Has another brother who lives in the U.K., could

25  reasonably be expected to be somebody who would have a visa

25

1  doesn't quite comport with the idea that he was running

2  afraid from al-Qaeda and Yemen at that time.  He tried to

3  recruit people to go to Yemen, including his close friend

4  and co-conspirator Luqman Babatunde.  Not somebody he did

5  not at all care about, since he would happily go to the

6  wolves for, somebody he cared about a lot.  He tried to

7  recruit him to go to Yemen and told Babatunde that he would

8  either go back with him or meet him there, suggesting that

9  the defendant himself was intending to return to Yemen.

10       All of that goes to suggest that the defendant was

11  up to more than we can now -- then we can prove he was up

12  to.  We are not asking your Honor to hold him responsible

13  for any theoretical plot or the like, but only for his

14  actions.  I bring this up because again his consistent

15  denials and refusals to acknowledge his motivation, his

16  agreement, and his actions cast significant doubt upon his

17  expressed denunciation and remorse, and I think all of that

18  goes into the ultimate question of what sort of sentence is

19  necessary to protect the public from the defendant's future

20  crimes.

21       He certainly appears to have been a model

22  prisoner.  I don't take any issue with his claims to that

23  front, or with anything that counsel or he has said about

24  his time in the MCC.  But I think all of that is readily

25  understood, is the defendant's desire to -- understandable

1   lower sentence.  There are certainly some people who come

2   into the system and use it as a platform for espousing those

3   views, but that's a personal decision that people make.

4   It's not what al-Qaeda teaches its recruits they should do

5   or advises them to do.  In fact, most of the advise given is

6   how to get yourself out of a jam.

7           So I don't think that they would view his

8   denunciation or actions here as anything less than trying to

9   get himself out of this situation.  And, in fact, I think it

10  would be a source of great pride and a way to stick one's

11  fingers in the eye of the United States, if in fact after

12  all of this time he would then rejoin the fight and was

13  heralded as a hero who in fact had beat the U.S. at its own

14  game and the like.

15          So, I don't think that it would at all negatively

16  affect his ability to rejoin the fight.  I think he

17  certainly would be a much more valuable member for having

18  gone through this process and gone through U.S. prison and

19  come out on the other side.

20          THE COURT:  Is there like a track record of folks

21  who have denunciated al-Qaeda and then come back to it

22  after?

23          MS. AHMAD:  Well, there's certainly been people

24  released from Guantanamo Bay who gave up significant

25  inculpatory information about al-Qaeda to the U.S.

29

1    according to the government, is his one interest.

2            You know, the crux of the government's argument is

3    that it is not possible that Mr. Babafemi changed.  It's not

4    possible that someone like Mr. Babafemi could change.  If

5    that's the case, we are in a great deal of trouble here in

6    this world.  There are a lot of people who are getting swept

7    up and going abroad, and we need to figure out ways to

8    retrust them.  We are not going to incarcerate -- the U.S.

9    is certainly not going to incarcerate its way out of it.

10   It's not impossible to change.  I think it's entirely

11   consistent with human nature.  What we know about even

12   people who are swept up in some theoretical fanaticism, that

13   they get a taste of it and it's not what they thought it was

14   and it's not for them, and they think about it some more and

15   they reflect, and that's what happened with Mr. Babafemi.

16           One fact that the government leaves out that I

17   think is critical to this analysis is the fact that Mr.

18   Babafemi did not hold to his agreement with al-Awlaki.  He

19   didn't return to Nigeria to recruit people.  He went on to

20   Saudia Arabia where he knew Nigerians could get work.  He

21   took the money and went to Saudia Arabia.  For all we know

22   he would have been in Saudia Arabia to this day, if he

23   hadn't been found there undocumented and deported back to

24   Nigeria.  He didn't reach out to al-Qaeda or AQAP, or

25   anybody while he made off to Saudia Arabia.

31

1    outlook.  I think those things are incompatible.

2             In any event, to back up to what I think are more

3    important considerations.

4             You know, the nature and circumstances of the

5    offense, that's the first factor listed under 3553(a)(1),

6    and here it is hard to conjure a more serious offense.

7             He, the defendant, sought out and joined this

8    terrorist group.  I agree with -- I draw the inference the

9    government wants me to draw that he was aware, given the

10   chronology of events, the chronology of the so-called

11   "underwear bomber crime," and this defendant's journey to

12   Yemen, that he was well-aware that this was a terrorist

13   group that was willing and indeed determined to attack

14   Americans and Europeans in their homelands.  This is not a

15   defendant who was sitting in his home connecting to al-Qaeda

16   and the Arabian Peninsula online.  He wasn't cajoled into

17   the activity that got him arrested by government agents.  No

18   need to wonder whether he would have done what he did but

19   for the initiation by government agents of the events that

20   led to his arrest.

21            In a very real sense, this defendant certainly was

22   - got a little issue about whether he still is that we just

23   gone over - but he certainly was the real deal when it comes

24   to terrorists.  He made a couple of very difficult journeys

25   from Nigeria to Yemen.  He met with the highest level of

33

1  years ago that had as one of its features an ability to take

2  a second look at someone, after some period of incarceration

3  passes.  In this case, and in many others, I find myself

4  second-guessing whether we gave up too much in the interest

5  of the certainty that the abolition of parole advances.  It

6  would be nice.  You know, it is a factor.  It may not be the

7  most compelling factor, in my view, in this sentence, but

8  whether or not there's a need to incapacitate this defendant

9  so he doesn't rejoin the fight is an important

10  consideration.  And it's not exactly the easiest thing in

11  the world to assess how genuine and sincere he is in

12  purporting to have turned away from the beliefs that led him

13  to go to Yemen.

14          He tells me here today that he wants to have an

15  opportunity to set straight other young would-be Jihadists.

16  And although the government has made a fairly powerful

17  credibility argument, as I mentioned earlier, I don't think

18  his inability to hold himself accountable for his behavior,

19  and the government has a good point there, it's incompatible

20  with his denunciation.  I wish I had a better feel for how

21  genuine it is.  I think I need to -- I know I need to know

22  now in 2015, not ten years from now, make some kind of a

23  judgment as to whether Mr. Babafemi will no longer be a

24  Jihadist when he gets out of prison.  I wish I had a better

25  feel for it.

35

1    Bureau of Prisons.

2            Thank you, everyone.

3            MS. HOYES:   Thank you, your Honor.

4            MS. AHMAD:   Thank you, Judge.

5            (The proceedings are concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25