

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:SME
F. #2017R00019

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 17, 2021

By ECF

The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Lawal Babafemi
      Docket No. 13-CR-109 (MKB)

Dear Chief Judge Brodie:

  The government respectfully submits this letter in response to defendant Lawal Babefemi's motion for a modification of an imposed term of imprisonment, pursuant to Title 18, United States Code, Section 3582(c)(1)(A), initially filed as a pro se submission on August 21, 2020 and followed by a supplemental brief by appointed counsel, filed on January 22, 2021 (collectively, the "motion" or "Def. Mot.").

  On April 29, 2014, the defendant pled guilty before the Honorable John Gleeson to Counts One and Two of the indictment, which charged him with conspiring to provide and in fact providing material support and resources, including services and personnel, including himself, to al-Qaeda in the Arabian Peninsula ("AQAP"), in violation of Title 18, United States Code, Section 2339B(a)(1). (ECF Docket Entry No. 32). He was sentenced on August 12, 2015 to 180 months' imprisonment on Count One and to 84 months' imprisonment on Count Two, to run consecutively, with credit for time served since the defendant's arrest on August 19, 2011, in Nigeria, which represented a downward variance from the Sentencing Guidelines ("U.S.S.G." or "Guidelines") range, which was calculated as 292 to 360 months. See Government Sentencing Memorandum dated April 24, 2015, ECF Docket Entry No. 59, at 6.

  The defendant now seeks a substantial reduction of his sentence due to the COVID-19 pandemic and his own health conditions. For the reasons set forth below, the defendant fails to demonstrate "extraordinary and compelling reasons" warranting the requested relief. Additionally, consideration of the 18 U.S.C. § 3553(a) factors merits his continued detention. Accordingly, the Court should deny the defendant's motion.

I.     Offense Conduct and Background

In 2010, Lawal Babafemi, a Nigerian citizen, travelled to Yemen, seeking to join and train with AQAP. (Government Sentencing Memorandum at 2.) In January 2011, after being deported to Nigeria for lacking proper identification papers, Babafemi again travelled to Yemen, where he met an AQAP facilitator and was transported to an AQAP safehouse. (Id. at 2-3.) There, he took an oath of allegiance to AQAP. (Id. at 3.) Notably, one of AQAP's primary goals was to attack the United States directly. Around the time Babafemi sought to join and train with AQAP, the terrorist organization claimed responsibility for the attempted Christmas Day 2009 bombing of a Detroit-bound passenger plane from Europe by Umar Farouk Abdulmutallab, and an October 2010 plot to send explosive-laden packages on U.S.-bound cargo flights.[1]

While in Yemen, Babafemi became close with Samir Khan, an American citizen and the head of AQAP's English-language media wing. (Id. at 2.) In 2010, Khan founded Inspire Magazine, an English-language online publication, produced by AQAP, a typical issue of which contained exhortations to violence, justifications for the killing of civilians in terrorist attacks, and instructions for the preparation of bombs and improvised explosive devices. (Id. at 2-3.) Babafemi contributed writing and editing assistance to Inspire. (Id. at 4.) He also wrote English rap lyrics about jihad for the purpose of inspiring people in English-speaking countries to conduct their own terrorist attacks without central direction from AQAP. (Id.)

Babafemi's original goal on arriving in Yemen was to stay and fight with AQAP in that country. (Id. at 5.) But after consulting extensively with Anwar al-Awlaki, a senior AQAP leader, Babafemi decided to return to Nigeria and recruit others to join the group. (Id.) He was given the equivalent of $8,600 in cash to fund those efforts. (Id.) Back in Nigeria, Babafemi attempted to recruit multiple people to al-Qaeda. (Id. at 6.)

The individuals with whom Babafemi directly dealt—Samir Khan and Anwar al-Awlaki—played significant roles in spreading the message of jihad to English-speaking audiences. Indeed, even today, nearly 10 years after his death, al-Awlaki is still commonly regarded as the leading figure inciting English-speaking Muslims to participate in violent jihad.

In August 2011, Babafemi was arrested in Nigeria. (Id.) In February 2013, he was indicted in the Eastern District of New York and in September 2013, he was extradited here from Nigeria. (Id.) Count One of the indictment charged that the defendant conspired to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). Count Two charged that the defendant provided and attempted to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). Count Three charged the use of a firearm, including a machinegun, and the brandishing and discharge of a firearm, in violation of 18 U.S.C. § 924(c). This count carried a 10-year mandatory minimum sentence, to

---

[1] Among other significant terrorist attacks, AQAP has also claimed responsibility for the 2015 shooting rampage at the offices of the French satirical newspaper *Charlie Hebdo*, where 12 people were killed and 11 injured, and for the shooting at Pensacola Naval Air Station on December 6, 2019, when a gunman shot, wounded and killed numerous people at the U.S. naval base.

run consecutive to any sentence on the material support counts. Count Four charged conspiracy to use a firearm, including a machinegun, in violation of 18 U.S.C. § 924(o).

The defendant is currently incarcerated at FCI Allenwood Low in Pennsylvania. To date, he has served less than 10 years of his 22-year term of imprisonment.

## II. The Instant Application

On July 13, 2020, the defendant filed a Request for Compassionate Release/Reduction in Sentence, citing to his underlying health conditions and the COVID-19 pandemic. See Pro Se Motion, Exhibit A, ECF Docket Entry No. 70 at 8. Specifically, the defendant referred to his "chronic kidney disease, Stage III (moderate)" and "hypertension" as grounds for release. Id.

On July 24, 2020, the warden of FCI Allenwood Low denied the defendant's request, writing that the defendant's age of 40 years old did not qualify for compassionate release for elderly inmates with certain medical conditions and that "consideration may also be given to inmates who have an incurable, progressive illness or who have suffered a debilitating injury from which they will not recover. Your case was reviewed and determined that although you have medical concerns, they are not debilitating." Pro Se Motion, Exhibit B, ECF Docket Entry No. 70 at 9. The warden further informed the defendant, "If you are not satisfied with this response, you may appeal through the Bureau of Prisons, Administrative Remedy Process by obtaining an Informal Resolution form through your Correctional Counselor." Id.[2]

On August 21, 2020 the defendant filed the instant pro se motion. On January 22, 2021, appointed counsel filed a supplemental brief in support of the motion. The Motion seeks compassionate release on the ground that his medical conditions – namely, kidney disease and hypertension – put the defendant at greater potential risk from the COVID-19 pandemic. See ECF Docket Entry No. 79.

## III. The COVID-19 Pandemic and BOP Response

In response to the COVID-19 pandemic, the Federal Bureau of Prisons (the "BOP") has implemented a series of "Action Plans" in order to minimize the risk of COVID-19 transmission into and inside its facilities. See bop.gov/coronavirus/. On March 13, 2020, the BOP announced that it was implementing the COVID-19 Phase Two Action Plan in order to minimize the risk of COVID-19 transmission into and inside its facilities. Id. As of that date, the Action Plan comprised certain preventive and mitigation measures, including the following: all incoming inmates were screened, and staff were regularly screened; contractor visits were limited to essential services, while nearly all attorney, social, and volunteer visits were suspended; inmate movements between facilities were extremely limited; and institutions were taking additional steps to modify operations to maximize social distancing. Id.; see also bop.gov/coronavirus/covid19_status.jsp.

---

[2] The government is not arguing that the defendant has failed to exhaust his administrative remedies.

3

The BOP has continued to modify operations at its facilities over the course of the pandemic, as appropriate, to respond to the continued health threat presented by COVID-19. Currently, all incoming inmates are screened and tested, and within each institution the BOP has implemented "modified operations to maximize social distancing," including efforts to minimize inmate gathering, while still allowing for mental health treatment, medical care, commissary visits, telephone and legal call usage, and other functions. See Federal Bureau of Prisons resources page, available at https://www.bop.gov/coronavirus/covid19_status.jsp.

Each institution has the authority to suspend social visitation as necessary, and staff at FCI Allenwood Low, where the defendant is incarcerated, have informed the government that social visits are currently suspended. Additionally, FCI Allenwood Low staff have informed the government that only limited group gathering is permissible, with attention paid to social distancing as much as possible, while still facilitating inmate access to the commissary, laundry, showers, telephone, and computers. All staff and inmates are screened for a temperature exceeding 100.4 degrees and overt respiratory symptoms, and issued appropriate face coverings, which they are required to wear when in public areas where social distancing cannot be achieved. Inmates who are symptomatic or have a temperature are isolated and tested for COVID-19. When a staff or inmate case of COVID-19 is identified, contact tracing of both inmates and staff is performed. All inmates identified as close contacts of the positive case are assessed for symptoms and tested. Further, inmates who spend time outside of the institution, such as for medical treatment, furlough, work release, or a court appearance, are tested upon return.

Currently, at FCI Allenwood Low, there is a single confirmed case of COVID-19 among inmates and staff.[3] Staff at FCI Allenwood Low have informed the government that vaccination of inmates at the institution has begun.

    IV.    The Court Should Deny the Defendant's Motion for A Sentencing Reduction

    A. Legal Standard

If a defendant has exhausted his administrative remedies, § 3582(c)(1)(A)(i) permits a court to modify an already imposed sentence upon a showing of "extraordinary and compelling reasons." Specifically, a court may "modify a term of imprisonment" when, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," and to the extent a reduction is consistent with the applicable policy statement in the Sentencing Guidelines, the court "finds that extraordinary and compelling reasons warrant such a reduction." Id.; see also United States v. Gotti, 2020 WL 497987, at *2 (S.D.N.Y. Jan. 15, 2020) ("It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification. He is simply eligible for a sentence modification. The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not

---

[3] Federal Bureau of Prisons, COVID-19 Cases, www.bop.gov/coronavirus (providing daily tallies of confirmed infections) (last accessed February 12, 2021, at 12:24 p.m.).

4

warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.").

The Guidelines and BOP policy have established clear criteria to aid in a court's determination of when compassionate release is appropriate pursuant to § 3582(c)(1)(A)(i). See U.S.S.G. § 1B1.13; see also BOP Program Statement 5050.50 ("Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)"), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. Both the Guidelines and the BOP Program Statement primarily limit compassionate relief to cases of serious illness or impairment, advanced age, or a need to care for a child, spouse, or registered partner. See id.; see also United States v. Traynor, 04-CR-0582 (NGG), 2009 WL 368927, at *1 n.2 (E.D.N.Y. Feb. 13, 2009). As the Court recognized in Traynor, Congress indicated that § 3582(c)(1) "applies . . . to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner." Id. at *1 (citing Senate Report No. 98–225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3304).

In United States v. Brooker (Zullo), 976 F.3d 230, No. 19-3218, 2020 WL 5739712 (2d Cir. Sept. 25, 2020), the Second Circuit held that "the First Step Act freed district courts to consider any potentially extraordinary and compelling reasons that a defendant might raise for compassionate release." Id. at 230.[4] Nonetheless, this Court should look to § 1B1.13 as highly probative evidence of Congressional intent, and hold that § 3582(c)(1)(A)(i) at most confers upon district courts authority to grant compassionate release on grounds that are categorically similar to, if not constrained by, those set forth in § 1B1.13. See United States v. Pinto-Thomaz, 454 F. Supp. 3d 327, 329 (S.D.N.Y. 2020) (holding that, under § 3582(c)(1)(A)(i), district courts have "discretion to grant compassionate release motions on grounds that are distinct from, but of similar magnitude and importance to, those specifically enumerated in Application Note 1 to U.S.S.G. § 1B1.13."); United States v. Ebbers, 432 F. Supp. 3d 421, 427 (S.D.N.Y. 2020) (concluding that § 1B1.13 is "anachronistic," but "nonetheless, helpful in defining a vague standard.").

A defendant seeking relief under § 3582(c)(1)(A) "bears the initial burden to put forward evidence that establishes an entitlement to a sentence reduction." United States v. Greenhut, No. 18-CR-00048 (CAS), 2019 WL 6218952, at *1 (C.D. Cal. Nov. 21, 2019); Cannon v. United States, No. CR 11-048 (CG), 2019 WL 5580233, at *2 (S.D. Ala. Oct. 29, 2019) ("[T]he defendant has the burden to show circumstances meeting the test for compassionate release."); see also United States v. Jones, 836 F.3d 896, 899 (8th Cir. 2016) (same under § 3582(c)(2)); United States v. Hamilton, 715 F.3d 328, 337 (11th Cir. 2013) (same); United States v. Butler, 970 F.2d

---

[4] While the government acknowledges that Zullo is controlling precedent, the government respectfully submits that Zullo was wrongly decided. In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission the authority to define the term 'extraordinary and compelling reasons. The First Step Act altered only the procedural mechanism in § 3582(c)(1) and did not revoke the authority delegated to the Commission in § 994(t), or purport to expand the basis for compassionate release beyond the categories identified by the Sentencing Commission in the application note to U.S.S.G. § 1B1.13.

1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

### B. The 3553(a) Factors Warrant Continued Detention

The defendant argues that his medical history, combined with the fact of the pandemic, constitute "extraordinary and compelling circumstances" to justify a sentencing reduction to time served. See Def. Mot. at 4. The medical circumstances described by the defendant do not justify such a drastic reduction in the defendant's sentence, particularly in light of the relevant Section 3553(a) factors and the magnitude of the defendant's crimes. See e.g., United States v. Jones, No. 3:99-CR-264-1 (VAB), 2020 WL 2782395, at *4 (D. Conn. May 29, 2020) (denying compassionate release application for defendant with, inter alia, hypertension and chronic kidney disease, in light of the 3553(a) factors); United States v. Seshan, No. 14 CR. 620 (JFK), 2020 WL 2215458, at *3 (S.D.N.Y. May 6, 2020) (denying compassionate release application for defendant with end-stage renal failure and hypertension in light of 3553(a) factors, given that defendant's drug offense involved discharge of a firearm).

While the coronavirus pandemic is, without question, a health crisis of the utmost gravity, the BOP has undertaken a variety of measures to mitigate the potential spread of COVID-19, including the suspension of social visits, restriction on inmate movement, and other means of mandating social distancing. And in fact, the present measures appear to be effective at FCI Allenwood Low, which currently has a single confirmed active COVID-19 infection. Thus, even assuming that the defendant's medical conditions place him at greater risk of harm during the pandemic, the specific circumstances of his incarceration do not rise to the type of "extraordinary and compelling" circumstances justifying the relief sought. See United States v. Messina, No. 11-CR-31 (KAM) (E.D.N.Y. May 11, 2020), ECF Docket Entry dated May 11, 2020 (denying compassionate release for 59 year old with history of heart attack, clogged arteries, and diabetes because, inter alia, the risk of infection at the defendant's current facility, which had no confirmed cases among inmates, was minimal).

Moreover, as of this writing, two vaccines have been approved for use in the United States to prevent COVID-19 infections and have begun to be distributed around the country, and a third has been submitted for emergency approval. Staff at FCI Allenwood Low have informed the government that vaccination of inmates at the institution has begun. The start of a mass vaccination effort throughout the country, and at FCI Allenwood Low, indicates that the defendant's potential to contract COVID-19 is a temporary one, and one that can be expected to diminish rapidly as more individuals in his institution receive vaccines, including the defendant himself.

Importantly, the factors set forth in 18 U.S.C. § 3553(a) clearly weigh against the defendant's release. See Gotti, 2020 WL 497987, at *2 ("The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances."). The defendant committed himself to a violent and sophisticated terrorist group in Yemen, where he met with and conspired with individuals at the highest levels of that organization. He contributed to Inspire Magazine,

AQAP's English language publication, a typical issue of which promoted and justified violence, including the killing of innocent civilians and the building of homemade bombs. While in Yemen, the defendant received weapons training and engaged in a gunfight. Thereafter, in consultation with Anwar al-Awlaki, the defendant sought to recruit additional English-speaking individuals to AQAP and accepted money to do so.

These are crimes of an extraordinary magnitude; as Judge Gleeson put it at the defendant's sentencing, "it is hard to conjure a more serious offense." Sent Tr. dated August 12, 2015, at 31:7. Any reduction in the defendant's sentence would not only pose a tremendous risk to the safety of the public, but would fail to "reflect the seriousness of the offense, . . . promote respect for the law, and . . . provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A). That is particularly the case where the defendant has recently sought, in an affidavit attached to his motion to vacate his conviction pursuant to 18 U.S.C. § 2255, to minimize the seriousness of his offense, in the hopes that it will win his release from prison. See ECF Docket Entry No. 78-2. To the contrary, the nature and gravity of the defendant's crimes mandate his continued detention.[5] See United States v. Sabir, No. 05-CR-673 (LAP), 2020 WL 5026883, at *5 (S.D.N.Y. Aug. 25, 2020) (denying compassionate release for a defendant convicted of providing material support to al-Qaeda, because "decreasing the sentence would. . . go counter to the mandates that a sentence should constitute just punishment for the offense and should deter others from engaging in similar conduct.").[6]

Moreover, the defendant has served less than half of the 22-year term of imprisonment that Judge Gleeson imposed. That sentence was sufficient, but not greater than necessary, in light of the extraordinarily serious crimes the defendant committed and the need to deter others from committing similar crimes of providing material support to a designated foreign terrorist organization. Reducing his sentence now "would diminish his transgressions and undermine the goals of the original sentence, among them, the need to dispense adequate

---

[5] The defendant also argues that his deportation to Nigeria upon release weighs in favor of granting the instant motion. Def. Mot. at 15-16. To the contrary, the inability to meaningfully supervise the defendant upon his deportation creates an even greater risk that the defendant might rejoin AQAP or otherwise engage in violence or criminal activity, underscoring the risk to the public posed by the defendant's release.

[6] The defendant cites to United States v. Hassoun, 470 F. Supp. 3d 804, 806 (N.D. Ill. 2020) in support of his application, arguing that Hassoun demonstrates that the commission of even violent terrorist activities does not preclude compassionate release. See Def. Mot. at 15. Hassoun, however, is distinguishable. Importantly, the Hassoun court cautioned that it was granting compassionate release because the defendant, who had "debilitating hereditary auto-inflammatory disease that puts him at a high risk of life-threatening complications from COVID-19" had been "encouraged by undercover law enforcement and never posed an actual threat to the public." Id. Importantly, the Court also emphasized that "[Hassoun's] conduct was not driven by religious ideology or any connection to a terrorist organization like ISIS or Al-Qaida." Id. Here, in contrast, the defendant sought out AQAP of his own accord and joined a highly organized, violent terrorist network. Those facts render Hassoun inapposite and underscore the threat this defendant would pose if released.

punishment and to deter others." United States v. Gray, No. 08-CR-00421 (BMC), 2021 WL 293380, at *3 (E.D.N.Y. Jan. 28, 2021).

V. Conclusion

For the reasons set forth above, the defendant's motion for compassionate release should be denied.

Respectfully submitted,

SETH D. DUCHARME
Acting United States Attorney

By: /s/
Sarah M. Evans
Assistant U.S. Attorney
(718) 254-6490

cc: Matthew Galluzzo, Esq. (by ECF)