UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
UNITED STATES OF AMERICA,                                  :
                                                           :  **MEMORANDUM**
                                                           :  **DECISION AND ORDER**
                  - against –                              :
                                                           :  13-cr-0109 (BMC)
LAWAL BABAFEMI,                                            :  20-cv-3384 (BMC)
                                        Defendant.         :
                                                           :
                                                           :
-----------------------------------------------------------X

**COGAN**, District Judge

Petitioner-defendant seeks habeas corpus relief under 28 U.S.C. § 2255 to vacate his conviction and sentence. Alternatively, he requests compassionate release pursuant to 18 U.S.C. § 3582(c). He is not entitled to relief under either statute and, therefore, both of his motions are denied.

## BACKGROUND

### I. Offense conduct

Defendant is a Nigerian citizen who traveled to Yemen in 2010 for the purpose of joining the terrorist organization known as al-Qaeda in the Arabian Peninsula ("AQAP"). AQAP is well known to Western authorities for having inspired or funded attempts to bring down U.S.-bound planes; for the Charlie Hebdo attack in Paris; and for a massacre of sailors and civilians at Pensacola Naval Air Station. Defendant was deported back to Nigeria from Yemen in 2011, but returned. On his return to Yemen, he met an AQAP agent and took an oath of allegiance to AQAP.

In Yemen, defendant established a relationship with an individual, the well-known terrorist Samir ibn Zafar Khan. Khan was a U.S. citizen who headed AQAP's

English-language propaganda wing. In particular, Khan was the founder of *Inspire Magazine*, an online English language publication that advocated violence against Western interests and contained instructions for the creation and use of bombs and other deadly devices. Defendant wrote or edited articles for the magazine to assist in disseminating its violent message.

Defendant had originally gone to Yemen for the purpose of fighting against Western interests as part of AQAP located in that country. While there, he received weapons training, including the use of a machine gun. Defendant had a number of meetings with the infamous Yemeni terrorist, Anwar al-Awlaki,[1] which led defendant to decide to return to Nigeria as a recruiter for al-Qaeda. He received $8600 in cash from AQAP to return to Nigeria and carry out this mission. In fact, upon his return to Nigeria, defendant contacted many people and pitched them on joining al-Qaeda.

## II.     Pre-trial proceedings and sentencing

Defendant was arrested by Nigerian authorities and indicted in the Eastern District of New York. He was extradited to face this indictment in 2013. The four-count indictment contained charges of conspiracy to provide material support to a foreign terrorist organization ("FTO") (18 U.S.C. §§ 2339B(a)(1) and 2339B(d)); the substantive crime of that conspiracy; use and brandishing of a firearm (18 U.S.C. § 924(c)); and conspiracy to use a firearm (18 U.S.C. § 924(o)). Notably, the latter two counts each carried a mandatory minimum sentence of seven or fifteen years' custody, respectively, and consecutive to Counts One and Two, and the indictment as a whole exposed defendant to life in prison.

---

[1] Both al-Awlaki and Khan were killed in a U.S. drone strike in 2011.

On April 29, 2014, represented by Federal Public Defender Lisa Hoyes, Esq., petitioner pled guilty before Judge Gleeson to Counts One and Two of the indictment pursuant to a plea agreement. The plea agreement included the usual waiver of appeal and right to make a habeas corpus motion, effective as to the sentence if the court sentenced defendant to 360 months' custody or less.

In his allocution, defendant gave Judge Gleeson all of the required assurances under Fed. R. Crim. P. 11. In fact, the transcript shows that Judge Gleeson went even further than Rule 11 requires in confirming defendant's understanding of the charges and the plea agreement; that he had thoroughly discussed the case with Ms. Hoyes; and that the guilty plea was voluntary. Judge Gleeson then asked defendant to explain what he had done that made him guilty of the charges, and defendant articulated the following:

> THE DEFENDANT: I did meet the Al Qaeda in Yemen and I collected some amount of money from them to recruit English speaking Nigerians for them. And when I eventually got to Nigeria, I indeed made attempt to recruit two persons for them.
>
> THE COURT: This was during the period between January of 2010 and August of 2011?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And when you -- did you take the money from Yemen and go back to Nigeria?
>
> THE DEFENDANT: Yeah, I took the money but I – I took the money. Eventually I went to Nigeria.
>
> THE COURT: When you took the money, when you were in Yemen, did you agree with at least one other person to provide material support to Al Qaeda in the Iranian [sic] Peninsula?
>
> THE DEFENDANT: Yes, I did.
>
> THE COURT: And I take it that that material support took the form when you got back to Nigeria of recruiting English speaking

3

Nigerians for Al Qaeda in the Iranian [sic] Peninsula?

THE DEFENDANT: Yes.

Prior to sentencing, Ms. Hoyes filed a nearly 100-page sentencing submission on defendant's behalf, arguing for a 15-year sentence. The submission included a lengthy, detailed, and highly articulate letter from defendant (who speaks and writes English) describing his entire life story, including how he became involved with AQAP, and again acknowledging his guilt and apologizing for his conduct. Among other things, defendant stated in the letter that "the moment I left the Damaj Institute along side Yahya, the Al-Qaida guy, I knew I have made the worst decision of my life."

At sentencing on August 12, 2015, Judge Gleeson sentenced defendant to the low end of the Guidelines' range of 292–365 months' custody, that is, 180 months' custody on Count One (conspiracy to support an FTO) and a consecutive 84 months' custody on Count Two (providing support to an FTO), with credit for time served since defendant's arrest in 2011. Defendant did not appeal.

**III.    The instant motions**

    **A.  The § 2255 motions**

On April 17, 2020, nearly five years after his sentencing, defendant filed a *pro se* motion for habeas corpus relief under 28 U.S.C. § 2255.[2] To the extent it is comprehensible, the motion appears to claim that defendant's sentence was substantively unreasonable and that Judge Gleeson insufficiently articulated the basis for the sentence; that relevant conduct should not have been considered in imposing sentence; that he had

---

[2] Defendant filed his motion in the Court of Appeals as a motion for leave to bring a second and successive § 2255 motion, but the Court of Appeals denied the leave motion as unnecessary and transferred the § 2255 motion here since defendant had not previously filed a § 2255 motion.

4

not committed an "actual" crime; that his sentence was disparate compared to other defendants convicted of terrorism crimes; that his defense counsel failed to review and discuss the Presentence Investigation Report with him; and that the imposition of restitution was improper.

Chief Judge Brodie, to whom this case was reassigned following Judge Gleeson's departure from the bench, appointed counsel to represent defendant under the Criminal Justice Act, and, on January 13, 2021, counsel filed what is titled on the docket as a "supplemental motion to vacate under § 2255." The motion includes an affidavit from defendant. The overarching point of the motion and affidavit is that defendant's guilty plea was not knowing and voluntary because he did not receive effective assistance of counsel. Defendant's argument is that his attorneys failed to advise him that his "mere association" with AQAP (which he now says was all that he did) was insufficient to make him guilty of providing material support, and that his lack of intent to harm Americans constituted a viable "abandonment" defense. He further asserts that he didn't have enough time to review the plea agreement and he never had a chance to explain his side of the story to Judge Gleeson.

I entered an Order directing defendant's former attorney Lisa Hoyes to submit a declaration responding to defendant's allegations concerning her representation of him. The declaration that she has submitted discusses her practice representing clients generally and defendant specifically. As to the general matters, her declaration covers all of the issues as to which defendant contends he was not advised. As to defendant specifically, she states that she visited defendant frequently at the MCC; that she reviewed with him all of the discovery materials that were not classified; and that she

discussed potential defenses to the charges, including defendant's stated lack of intent to harm Americans. Her declaration also states that defendant informed her that he did take money from Al-Qaeda with the intention to recruit English-speaking Nigerians to travel to Yemen and that he made such recruitment efforts once he returned to Nigeria.

The declaration goes on to explain that based on defendant's statements to her, the discovery, and her own legal research, she believed that the facts were sufficient to sustain the material support charges against defendant. She denies ever advising defendant that "mere association" with a terrorist organization was enough to make him guilty of the crimes charged. She also states that she discussed an abandonment defense with defendant; the basis for it offered to her by defendant was that he had used the money given to him by al-Qaeda to start a business in Nigeria. She advised him that having received the money for the purpose of recruiting Nigerians for al-Qaeda and having actually done so, his use of the money to start a business, even if it could be proven to a jury as a matter of fact, did not constitute grounds for an abandonment defense.

In addition, her declaration explains that she advised him that he could receive a significant sentence if convicted at trial, including a mandatory 10-year sentence on Count III. In fact, defendant was facing a life sentence if convicted on all charges.

Finally, Ms. Hoyes avers that she gave defendant a copy of the proposed plea agreement at the MCC in advance of the date of the guilty plea, and that she made sure he had "ample time to read it, ask me questions, and discuss it with me in its entirety." She advised defendant that the decision whether to plead guilty or proceed to trial was entirely his, and she has no recollection of defendant ever saying that he wanted to go to

trial. After his guilty plea, Ms. Hoyes met with defendant to prepare him for his presentence interview, and she was present at the interview. She thereafter reviewed the PSR with him and made objections to correct errors and make sure the report was accurate according to what defendant had said during the interview.

### B. The § 3582(c)(1)(A) motions

On August 21, 2020, defendant filed a *pro se* motion for compassionate release. The motion cites plaintiff's high blood pressure and chronic kidney disease, coupled with the COVID-19 pandemic, as the grounds for release. He also contends that because he will be deported to Nigeria at the conclusion of his sentence, he is not a danger to the public. Finally, he contends that he has been rehabilitated in prison by taking courses and turning to his faith. On January 22, 2021, appointed CJA counsel filed what is entitled a "second motion to reduce sentence" on the same grounds.

## DISCUSSION

### I. The § 2255 motions

As the Second Circuit has observed, "Habeas corpus is not a neutral proceeding in which the petitioner and the State stand on an equal footing. Rather, it is an asymmetrical enterprise in which a prisoner seeks to overturn a presumptively valid judgment of conviction." Pinkney v. Keane, 920 F.2d 1090, 1094 (2d Cir. 1990). It is defendant's burden to show that his conviction or sentence is contrary to law. See id.; see also Hawkins v. Costello, 460 F.3d 238, 246 (2d Cir. 2006). He has not come close to meeting that burden here.

First, his claims are time-barred under 28 U.S.C. § 2255(f). That statute provides a limitations period of one year from the date a defendant's conviction becomes final.

7

Here, defendant's conviction became final fourteen days after the judgment was entered on August 17, 2015, and thus defendant had to bring any § 2255 motion by August 31, 2016. See United States v. Wright, 945 F.3d 677, 683 (2d Cir. 2019) (conviction final fourteen days after judgment is entered if no notice of appeal or other post-conviction motion is filed). He is more than three years late.

Defendant attempts to escape the time bar through equitable tolling. To do that, he would have to demonstrate both extraordinary circumstances beyond his control and due diligence. See id. at 684-85. He has not attempted to demonstrate either, undoubtedly because he knew nothing more when he finally filed his § 2255 motion than he did the day he was sentenced, and nothing impeded him from filing the motion years earlier.

Instead, he asserts his "actual innocence," another gateway to consideration of the merits of an otherwise time-barred § 2255 motion. See McQuiggin v. Perkins, 569 U.S. 383, 392 (2013) (actual innocence, or the fundamental miscarriage of justice exception, is grounded in the equitable discretion of habeas courts and may allow pursuit of an otherwise untimely motion). But actual innocence requires a much stronger showing than defendant has made here. He has to produce "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial" and "show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." Schlup v. Delo, 513 U.S. 298, 324-27 (1995).

The only "new evidence" defendant has produced is his own conclusory, self-serving affidavit. It is not only unconvincing by itself, but when measured against his

8

prior statements to Judge Gleeson – at his plea hearing, in his lengthy presentence letter, and at sentencing – the material parts of it are patently incredible. No further evidence beyond defendant's own inconsistencies would be necessary to deny his motion, but when his affidavit is further juxtaposed against the detailed declaration of Ms. Hoyes, it is clear that defendant has made no showing of "actual innocence" as required by the cases. See, e.g., Stein v. Stallone, No. 17-CV-0670, 2019 WL 5578236, at *12 (N.D.N.Y. Oct. 29, 2019) (rejecting claim of actual innocence based on defendant's self-serving affidavit in light of defendant's "unequivocal" guilty plea, statements at the plea hearing, and statements at sentencing); Read v. Thompson, No. 13-CV-3661, 2016 WL 165715, at *10 (S.D.N.Y. Jan. 13, 2016) (rejecting claim of actual innocence based on unreliable and incredible affidavit).

For the same reason, defendant's ineffective assistance of counsel claim fails on the merits, even without regard to the statute of limitations problem. The standard for proving that claim has been stated too often to require any discussion – defendant must prove that counsel's actions were objectively unreasonable and there is a reasonable probability that but for counsel's errors the factfinder would have possessed reasonable doubt as to petitioner's guilt. See Strickland v. Washington, 466 U.S. 668, 687 (1984). Here, since I am permitted to resolve disputes raised by the affidavits in the context of a § 2255 motion, see Chang v. United States, 250 F.3d 79, 85-86 (2d Cir. 2001), I find that Ms. Hoyes' thorough declaration relates the actual advice defendant received, and, upon that finding, it is clear that defendant can satisfy neither prong of Strickland. Specifically, other than defendant's affidavit on this motion, the record is overwhelming that he knew he was guilty, that he voluntarily pled guilty with full awareness of his

9

rights and of the risks of trial, that he had no viable defenses to Counts One and Two, and that there was a factual basis for his guilty plea.[3]

The record conclusively shows that defendant's § 2255 claims are without merit. There is no need for a further hearing. See Puglisi v. United States, 586 F.3d 209, 218 (2d Cir. 2009) (no hearing required where defendant failed to establish a plausible claim for relief under § 2255), Chang, 250 F.3d at 86 (district court need not hold full testimonial hearing where defendant's motion "involve[s] a generic claim . . . based solely on his own highly self-serving and improbable assertions").

## II. Compassionate release

In general, a "court may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). However, a convicted defendant may bring a motion to reduce the term of his imprisonment under the compassionate release statute. 18 U.S.C. § 3582(c)(1)(A)(i). A defendant may only apply to the court for release under this provision once he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [his] behalf or the lapse of 30 days from the receipt of such a request by the warden." Id. § 3582(c)(1)(A). The parties agree that defendant has exhausted his administrative rights here.

Upon proper exhaustion, a court may reduce a term of imprisonment, after considering the factors set forth in 18 U.S.C. § 3553(a), if it finds that "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent

---

[3] Defendant's remaining claims are even less substantial. Even if these claims were not time-barred and further barred by his failure to appeal and his appellate waiver, they are meritless. Defense counsel's argument at sentencing highlighted the sentences of others convicted of terrorism to argue for a lesser sentence, Judge Gleeson properly articulated his rationale for the sentence – explaining his consideration of defendant's offenses, the need to keep the public safe from future crimes, and defendant's personal history and characteristics – and defendant received a substantively reasonable sentence 28 months below the bottom end of the guidelines range.

with applicable policy statements issued by the Sentencing Commission." Id. The moving defendant bears the burden of showing that these factors compel his release. See United States v. Ebbers, No. 02-CR-1144, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) (citing United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.")). In determining what constitutes "extraordinary and compelling reasons," a district court has "discretion" to consider "the full slate" of arguments that defendants present to support a sentence reduction. United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020). "The only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason.'" Id. at 238 (quoting 28 U.S.C. § 994(t)).

Even if extraordinary and compelling circumstances exist, they must outweigh the 18 U.S.C. § 3553(a) factors to warrant a reduction in sentence. These factors include, *inter alia*, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed, the kinds of sentences available, and any pertinent Sentencing Commission policy statement. A sentence reduction is consistent with the Sentencing Commission's policy statements if the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2). The § 3142(g) factors are largely duplicative of those in § 3553(a), but they also include whether the offense is a crime of violence and the weight of the evidence against the defendant.

When the COVID-19 pandemic was in its early stages, some courts were amenable to considering co-morbidity factors as themselves sufficient to constitute extraordinary and compelling circumstances.  See, e.g., United States v. Colvin, 451 F. Supp. 3d 237, 241 (D. Conn. 2020); United States v. Zukerman, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020).  As the fatality rate from the disease has become better understood, however, many decisions reject the mere existence of co-morbidity factors alone as sufficient to constitute extraordinary and compelling circumstances.  See, e.g., United States v. Ferguson, No. 19-CR-173, 2021 WL 1105228, at *4 (D. Conn. Mar. 23, 2021); United States v. Danilovich, No. 12-CR-171, 2020 WL 3642246, at *1 (S.D.N.Y. July 6, 2020).  Despite the ravages of the disease at the outset of the pandemic, preventative measures have become more widely applied, including in the Bureau of Prisons, treatments have improved, and more prisoners and staff have been vaccinated, suggesting that COVID-19 poses a lesser risk of infection and severe illness to the prison population today than it has for the past year, even for inmates who have co-morbidity factors.

The facility where defendant is incarcerated, FCI Allenwood Low, has been aggressive in taking preventative measures.  Social visits have been suspended; only limited group gatherings are allowed and are subject to social distancing requirements; inmates and staff are regularly temperature checked and checked for any respiratory symptoms; and vaccinations have begun.  Of the 331 deaths of prisoners and staff across the country from COVID-19 (out of about 150,000 total inmates and 36,000 total staff), none have occurred at FCI Allenwood Low, and the facility has only one confirmed active inmate case at this time.[4]

---

[4] See https://www.bop.gov/coronavirus/ (last visited 3/31/2021).

I recognize that defendant has conditions, kidney disease and high blood pressure, that increase his risk of severe illness or death if he contracts COVID-19. But there is no indication in the record that he has a high risk of becoming infected with COVID-19, given the low incidence of infection at the facility, or that he would not recover from such an infection. I cannot find that the pandemic plus his conditions constitute an extraordinary or compelling circumstance that would warrant his release.

Even if I found otherwise, the factors under 18 U.S.C. § 3553(a) do not weigh in favor of his release. As Judge Gleeson observed, the nature and circumstances of defendant's crime are about as aggravated as it gets. He aligned himself with a deadly al-Qaeda section. He met with and received instructions from the high command of that terrorist organization. He used his fluency and skill in English to contribute to their English-language magazine that urged and taught violence against Western interests. By his own admission, he at least handled weapons, and the Government's proof shows he received training and used those weapons. He sought to bring others onto the twisted path that he chose for himself.

Other § 3553(a) factors also weigh in favor of denying his motion. General deterrence is essential here so that the severe consequences of choosing terrorism are apparent to all who might consider it. Moreover, specific deterrence as to defendant is also important. Even at this stage, I am not convinced that defendant is sincere in his renunciation of terrorism. If he were, and if he had any respect for the law, he would not have submitted what I have found to be an essentially false affidavit in support of his § 2255 motion, as shown by its conflicts with his own prior testimony and the far more

substantial declaration of the Federal Public Defender who represented him with the thoroughness that is typical of that office.

Finally, I note that defendant has not served even half of his sentence. Judge Gleeson's sentence was fully consistent with the parsimony clause of § 3553(a), and upon consideration of all available information relating to defendant, I see no material changes with the passage of time that would warrant a different conclusion.

## CONCLUSION

For the reasons stated above, defendant's motions under 28 U.S.C. § 2255 and 18 U.S.C. § 3582(c) are denied. He has failed to make a substantial showing of the denial of a constitutional right. Therefore, a certificate of appealability shall not issue. 28 U.S.C. § 2253. Further, I certify that any appeal from this Order would not be taken in good faith. See 28 U.S.C. § 1915(a); Coppedge v. United States, 369 U.S. 438, 444 (1962).

**SO ORDERED.**

Digitally signed by Brian M. Cogan

U.S.D.J.

Dated: Brooklyn, New York
March 31, 2021